FRANCES M. AVERILL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE G. AVERILL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE G. AVERILL AND FRANCES M. AVERILL, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80076, 82913, 82914, 82915. Promulgated March 17, 1938.

*Leonard A. Pierce, Esq.,* and *Carroll N. Perkins, Esq.,* for the petitioners.

*Dean P. Kimball, Esq.,* and *A. T. Akin, Esq.,* for the respondent.

### OPINION.

ARNOLD: These proceedings, consolidated for hearing, involve deficiencies, individual and joint, for the years and in the amounts following:

| Taxpayer | Year | Deficiency |
|---|---|---|
| Frances M. Averill | 1931 | $5,938.86 |
| Do. | 1932 | 21,947.80 |
| George G. Averill | 1932 | 27,302.78 |
| George G. Averill and Frances M. Averill | 1933 | 47,382.68 |

The issue presented is whether the gain realized upon payment at maturity of bonds owned by the petitioners is taxable as capital gain or as ordinary income. Petitioners have abandoned the other allegations set forth in their petitions.

The parties have submitted the proceedings upon a written stipulation of facts with attached exhibits. We adopt the stipulation as our findings of fact, summarizing herein the facts deemed necessary to understand the issue presented.

Petitioners are husband and wife, residing in Waterville, Maine. The circumstances under which they acquired the bonds maturing during the taxable years were as follows:

For more than two years prior to January 1, 1927, petitioners were stockholders of the Keyes Fibre Co., a Maine corporation, whose only outstanding stock consisted of 6,000 shares of common. George G. Averill owned 1,888 shares thereof and Frances M. Averill owned 1,500 shares thereof; their stock had a statutory basis for determining gain or loss of $223,295 and $187,500, respectively.

By a contract dated July 27, 1927, the owners of 5,912 shares of stock of the Keyes Fibre Co., hereinafter called the old company, agreed with the Rex Pulp Products Co., a Maine corporation, hereinafter referred to as Rex, that they would "sell, assign and convey all of the shares owned by them to a new corporation to be organized * * * at the agreed purchase price of seven hundred fifty dollars ($750) per share." Rex agreed that it would cause the newly organized corporation to pay the purchase price of $750 per share on or before August 11, 1927, and that payment "of the purchase price for said shares" would be four-ninths in cash and five-ninths in first mortgage bonds of the new corporation. The agreement provided that the first mortgage securing the bonds should "constitute a first lien on all the real estate, machinery, patents, patent rights, application for patents, contracts and all other property now owned or hereafter acquired" by either the old company, Rex, or the corporation to be organized.

Pursuant to the contract of July 27, 1927, the Keyes Fibre Co., a Maine corporation, hereinafter referred to as the new company, was formed. On August 11, 1927, the necessary corporate resolutions were voted by the directors and stockholders of the old company, Rex, and the new company, whereby the business and the assets of the old company and Rex were combined in the new company. The new company acquired all the assets of Rex in exchange for 134,993 shares of its common stock and the assumption of all liabilities of Rex. The new company acquired all but 88 shares of the stock of the old company, which it assigned and delivered to a trustee for the shareholders of the old company, the assignment being collateral security for the new company's obligations under the contract of July 27, 1927.

The old company then duly voted to sell and convey all its real and personal property to the new company for the agreed purchase price of $4,500,000, payable four-ninths in cash and five-ninths in bonds, plus interest on $2,500,000 from August 11 to September 1, 1927, at which date the bonds began to draw interest. Payment of the purchase price for the assets was made to the old company, which distributed the proceeds by a liquidating dividend of $750 per share, payable four-ninths in cash, $2,000,000, and five-ninths in bonds of the new company, $2,500,000, plus $3.33 per bond for interest adjustment from August 11 to September 1, 1927. The new company, as a stockholder of the old company, upon receipt of the liquidating dividend, immediately transferred it to the former stockholders in exchange for their stock, in accordance with the terms of the contract of July 27, 1927. Following payment in full of the liquidating dividend the officers of the old company were directed to dissolve it.

After carrying out the provisions of the contract of July 27, 1927, and the corporate resolutions of August 11, 1927, the new company had acquired all the assets of the old company and of Rex, and the petitioners had accepted in exchange for their shares of stock a lesser amount of cash and a larger amount of bonds than provided for in said contract, namely, $346,000 cash and $1,070,000 bonds, as to George G. Averill, and $275,000 cash and $850,000 bonds, as to Frances M. Averill. The bonds were serial bonds, maturing 10 percent each year on and after September 1, 1931, until September 1, 1937, when the remaining 40 percent matured. The bonds were worth par at the time of their receipt in 1927, and no other cash or property was received by petitioners in 1927 on account of these transactions.

Petitioners filed separate income tax returns for 1927 and reported the gains from the disposition of their stock upon the installment basis, the cash received being 24½ percent of the total consideration for their stock. Respondent made no adjustment as to Frances M. Averill's return for 1927, but he disallowed the use of the installment basis as to George G. Averill and computed the gain under the reorganization exchange provisions. Since the gain involved was greater than the cash received, the respondent taxed as gain the entire cash received, giving credit, however, for the gain already reported. As a result of this adjustment George G. Averill paid under protest an additional tax for 1927. No claim for refund was filed by George G. Averill for 1927.

During the taxable years certain of the bonds received by the petitioners in the 1927 transaction matured and petitioners received payment therefor from the new company. In 1932 George G. Averill received $107,000 for 107 bonds. In his income tax return for 1932 he reported a capital gain therefrom of $84,074.81, which amount re-

spondent has treated as ordinary income in determining the deficiency herein.

In 1931 Frances M. Averill received $85,000 for 85 bonds and reported a capital gain therefrom of $70,831.05 on her 1931 income tax return. Respondent treated this gain as ordinary income in determining the deficiency herein.

In 1932 Frances M. Averill received $85,000 from 85 bonds and reported a capital gain therefrom of $70,730.95 in her 1932 income tax return. Respondent treated this gain as ordinary income in determining the deficiency herein.

In 1933 George G. Averill and Frances M. Averill, together, received $167,000 from 167 bonds. They reported in their joint income tax return for 1933 a capital gain of $135,719.29, which the respondent has treated as ordinary income in determining the deficiency herein.

At all material times up to August 11, 1927, George G. Averill was a director, treasurer, and clerk of the company. Frances M. Averill held no office in the old company. Neither of the petitioners held office in nor was employed by the old company, Rex, or the new company after August 11, 1927.

The real issue in these proceedings, whether the gain realized in the taxable years is capital gain or ordinary income, necessarily relates back to the transaction which occurred during July and August 1927. In order to understand the present contentions of the parties, their opposing positions with respect to that transaction must be understood. The petitioners considered the 1927 transaction a *sale* and reported the profits realized therefrom upon the installment basis. The respondent, however, considered the transaction a statutory reorganization, and recognized gain, at least as to George G. Averill, to the extent of the cash received under section 203 (b) (2) and (d) (1) of the Revenue Act of 1926.[1] The amount of gain realized, the statutory basis for computing gain, the amounts of cash received, and the value of the bonds at the time of the sale or exchange, have been stipulated by the parties.

---

[1] SEC. 203. (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized, except as hereinafter provided in this section.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) (2) No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) (1) If an exchange would be within the provisions of paragraph (2), \* \* \* of subdivision (b) if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

Our first inquiry, therefore, is whether there was a statutory reorganization. The petitioners seek to apply the general rule, section 203 (a), that the entire amount of the gain or loss shall be recognized upon the sale or exchange of property. They would eliminate the 1927 transaction from the reorganization provisions found in the exceptions to the general rule. If, however, there was a reorganization, the 1927 transaction necessarily falls under the exception appearing in subdivision 203 (b) (2) and 203 (d) (1), which limits the gain recognized to the amount of the cash received, recognition of the remainder being postponed until disposition of the stock or securities received in the exchange. The principal argument advanced by petitioners against the application of these subdivisions is that the bonds were not to be treated as "securities" within the meaning of section 203 (b) (2). It is contended that the bonds were worth their face value, were the equivalent of cash, and that the entire transaction is governed by the Supreme Court's decision in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462, and the decisions of the Second Circuit in *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937; 288 U. S. 599, and *Worcester Salt Co.* v. *Commissioner*, 75 Fed. (2d) 251. It is further pointed out that petitioners' contention here is in accordance with the respondent's ruling appearing in Mimeograph 4555, C. B. 1937–I, p. 244.

Petitioners' argument that the bonds are not "securities" within the meaning of the reorganization provisions of the statute has been decided adversely to them by the Supreme Court in *Helvering* v. *Watts*, 296 U. S. 387, wherein the Court specifically stated: "The bonds, we think, were securities within the definition, and can not be regarded as cash, as were the short-term notes referred to in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462." In *Burnham* v. *Commissioner* (C. C. A., 7th Cir.), 86 Fed. (2d) 776; certiorari denied, 300 U. S. 683, the Circuit Court held that ten-year promissory notes were of sufficient dignity and formality to fall within the term "securities" as used in section 203 (b) (2). In *Commissioner* v. *Kitselman* (C. C. A., 7th Cir.), 89 Fed. (2d) 458; *Helvering* v. *Leary* (C. C. A., 4th Cir.), 93 Fed. (2d) 826; *Commissioner* v. *Newberry Lumber & Chemical Co.* (C. C. A., 6th Cir.), 94 Fed. (2d) 447; and *Frederick L. Leckie*, 37 B. T. A. 252, the courts and the Board recognized that bonds are securities.

There remain, however, certain additional statutory requirements which must be met before it can be said that this 1927 transaction was in fact a reorganization. Section 203 (b) (2) provides that the securities received must be in a corporation a party to the reorganization; that the stock exchanged must be stock in a corporation a party to the reorganization; and that the exchange must have been made in pursuance of a plan of reorganization.

The plan of reorganization is contained in the contract of July 27, 1927. The primary purposes of that contract was to bring about a merger or consolidation of the old company and Rex in the new company. The intermediate steps, as revealed by the minutes of stockholders' and directors' meetings of the different corporations, were simply a part of the entire scheme to effect the consolidation or merger. The exchange of petitioners' stock for cash and bonds was made pursuant to the plan of reorganization. The old company was a party to the reorganization because the majority of its voting stock was acquired by the new company, which clearly conforms to the definition of the term "a party to a reorganization" found in section 203 (h) (2) of the Revenue Act of 1926.[2] Likewise, the new company is a party to the reorganization because it acquired the old company's stock, thereby fitting the facts herein to the statutory pattern, which is, that stock of the old company a party to a reorganization was, in pursuance of a plan of reorganization, exchanged for cash and securities in another corporation a party to the reorganization.

In *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378, the Supreme Court, in considering what constitutes a reorganization, reaffirmed the language used in its opinion in *Pinellas Ice & Cold Storage Co.*, *supra*, that a merger or consolidation includes some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words, and added that the interest which the seller acquires in the affairs of the purchasing company "must be definite and material; it must represent a substantial part of the value of the thing transferred. This much is necessary in order that the result accomplished may genuinely partake of the nature of merger or consolidation." Whatever definite and material interest these petitioners acquired in the transferee corporation is represented by their bonds. It has been held by the Board and by the courts that bonds received in exchanges, similar in many respects to the exchanges here in question, gave the bondholders a sufficient continuity of interest to meet the requirements of a statutory reorganization. *Kaspare Cohn Co., Ltd.*, 35 B. T. A. 646; *Lucien H. Tyng*, 36 B. T. A. 21; *Lilienthal* v. *Commissioner* (C. C. A., 9th Cir.), 80 Fed. (2d) 411; *Helvering* v. *Watts, supra; Helvering* v. *Leary, supra.*

The bonds which these petitioners received were secured by a "First Mortgage and Deed of Trust" on practically all of the property of the new company. An examination of that indenture reveals

---

[2] SEC. 203. (h) As used in this section and sections 201 and 204—

\*      \*      \*      \*      \*      \*      \*

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

that the bondholders, under certain circumstances and in some respects, had superior equities to the equities of the stockholders. This was particularly true in cases of default in the payment of interest or principal, as the trustee therein named was thereupon authorized to take possession of the mortgaged property, exclude the company and its agents and servants wholly therefrom, and manage, operate, and conduct the mortgagor's business, and exercise all the rights and powers of the company in its name or otherwise as the trustee might deem best, with full power and authority to sell and dispose of the property for the benefit of the bondholders. Likewise, in case of foreclosure proceedings the rights of the stockholders were subordinated to the rights of the bondholders. If, therefore, the mortgagor became financially involved the bondholders' interest in the corporate assets and business became paramount to the interest of the ordinary stockholder. This relationship is explained by the court in the *Kitselman* case, *supra*, as follows:

The bondholders are ordinarily viewed merely as creditors but when the assets of the corporation are less than its obligations, the bondholders are actually, and for all practical purposes pretty much the corporation. All that remains for the stockholders is the corporate charter—the corpse of the defunct corporation.

Considering all the facts herein and the foregoing authorities, it is our opinion that the contract of July 27, 1927, constituted a plan of statutory reorganization and that, pursuant to that plan, a statutory reorganization was effected wherein petitioners exchanged their stock for cash and securities in the new corporation. Our decision that there was a statutory reorganization distinguishes this case from *Worcester Salt Co.*, *supra*, relied upon by the petitioners. The petitioners' argument respecting the effect of the respondent's ruling in Mimeograph 4555, *supra*, is inapplicable, as the Board has already rejected this principle in its decisions in the *Kaspare Cohn* and *Tyng* cases, *supra*.

Petitioners' second contention is that, even if the 1927 transaction was a statutory reorganization, nevertheless, they are entitled to report the gain from the transaction upon the installment sales basis under section 212 (d) of the Revenue Act of 1926.[3] The contention

---

[3] Sec. 212. (d) Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

is based upon an unusual construction and application of subdivisions (d) and (e) of section 202 with relation to section 203. It is argued that (d) and (e) incorporate section 203 in section 202, the effect of which is to preserve to the taxpayer the privilege granted by section 212, regardless of the provisions of section 203 (b) (2) and (d) (1).

In our opinion any such construction of sections 202 and 203 is unwarranted. Section 202 [4] deals with the determination of gain or loss from the sale or other disposition of property, while section 203 deals with the recognition of gain or loss from sales or exchanges of property, and lays down the general rule that "the entire amount of gain or loss, determined under section 202, shall be recognized, except as hereinafter provided in this section." Considering the specific subdivisions of section 202, we find that (a) is correlated with subdivisions (a) and (b) of section 204, so that the statutory basis, provided in section 204, will be used in determining the amount of gain or loss realized from the sale or other disposition of property. Subdivision (b) provides for computing the amount of gain or loss. Subdivision (c) defines "the amount realized from the sale or other disposition of property." Subdivision (d) specifically provides that the gain or loss determined under section 202 shall be recognized, in the case of a sale or exchange, to the extent provided for by section 203. This subdivision, therefore, expressly recognizes the applicability of section 203 to questions of *when* gain is to be recognized. Subdivision (e) obviously makes no provision for the determination of the amount of gain or loss. The provisions thereof are "merely a statutory authorization for reporting income on the installment

---

[4] SEC. 202. (a) Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision (a) or (b) of section 204, and the loss shall be the excess of such basis over the amount realized.

(b) In computing the amount of gain or loss under subdivision (a)—

(1) Proper adjustment shall be made for any expenditure or item of loss properly chargeable to capital account, and

(2) The basis shall be diminished by the amount of the deductions for exhaustion, wear and tear, obsolescence, amortization, and depletion which have since the acquisition of the property been allowable in respect of such property under this Act or prior income tax laws; but in no case shall the amount of the diminution in respect of depletion exceed a depletion deduction computed without reference to discovery value or to paragraph (2) of subdivision (c) of section 204. In addition, if the property was acquired before March 1, 1913, the basis (if other than the fair market value as of March 1, 1913) shall be diminished in the amount of exhaustion, wear and tear, obsolescence, and depletion actually sustained before such date.

(c) The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

(d) In the case of a sale or exchange, the extent to which the gain or loss determined under this section shall be recognized for the purposes of this title, shall be determined under the provisions of section 203.

(e) Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received.

basis." *Wobbers, Inc.*, 26 B. T. A. 322, 328. It simply preserves to taxpayers the privilege of making their returns on the installment basis in accordance with section 212 (d), notwithstanding any other provisions of section 202.

In considering the petitioners' first contention we have held that the 1927 transaction was a statutory reorganization, and that it comes within the exception contained in section 203 (b) (2). Standing alone, section 203 (b) (2) would postpone the recognition of any gain until a sale or other disposition of the bonds. But when the provisions of section 203 (d) (1) are considered with relation to section 203 (b) (2), gain is to be recognized to the extent of the cash received. Recognition of the remaining gain is postponed until the sale or other disposition of the bonds, and, as some of these bonds matured during the taxable years herein, gain will be recognized accordingly.

Petitioners' last contention is that the payment of bonds maturing during the taxable years here in question constitutes a "sale or exchange" within the meaning of the capital gain provisions of section 101 of the Revenue Acts of 1928 and 1932. This question has already been determined against the taxpayers' contention in a number of Board cases. In *Ernest Brown*, 36 B. T. A. 178, it was specifically discussed, and the arguments which petitioners are now advancing were rejected, as they had been before in our decisions in *John H. Watson, Jr.*, 27 B. T. A. 463, and *Arthur E. Braun, Trustee*, 29 B. T. A. 1161. Prior to the *Watson* decision the Board had held the opposite view, *Henry P. Werner*, 15 B. T. A. 482, but the latter case was overruled by the former, and since then the rule has been that the payment of bonds at maturity is not a sale or exchange of capital assets, but the fulfillment of a contractual obligation to repay money in accordance with fixed terms.

In view of our decisions that the gain resulting from the redemption of bonds shall be taxed as ordinary income, we deem it unnecessary to again review the authorities, but there are two cases cited by the petitioners that we shall discuss briefly. We can not attribute to our decision in *John D. McKee et al., Trustees*, 35 B. T. A. 239, the persuasive quality which petitioners seek to give it. The facts in the *McKee* case are essentially different, because there the trustees sold their bonds prior to the date of maturity. With the sale there was a realization of profit, and the mere fact that the bonds matured on the following day can not detract from the fact that profit was realized by a sale of the capital assets, and not by the maturity of the bonds. Likewise, our opinion in *Mary S. Childs*, 35 B. T. A. 1125, does not control the question here presented, because the *Childs* case involved the redemption of preferred stock, while here we are concerned with the payment of bonds upon their maturity. Payment

of a bond in accordance with its terms "is nothing more than the discharge of a contractual obligation to repay a sum loaned"; whereas the redemption of preferred stock, issued subject to retirement, is "in every real sense a sale." *Mary S. Childs, supra,* p. 1127.

The foregoing analyses of the petitioners' contentions, and the authorities examined with respect thereto, indicate that these contentions are not well founded. Therefore, we approve the respondent's determination and hold that the gain realized upon maturity of the petitioners' bonds during the taxable years was properly subjected to tax as ordinary income.

Reviewed by the Board.

*Decision will be entered for the respondent.*